IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>NELSON MORALES and CINDY BAILEY,<br><br>Defendants. | **MEMORANDUM OPINION AND ORDER**<br><br>Judge Dee Benson<br><br>Case No. 2:08-CR-73 |

Defendants Nelson Morales and Cindy Bailey are charged in the sole count of the Indictment with possession with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance within the meaning of 21 U.S.C. § 821. This motion to suppress arises out of the alleged improper stop, detention, and search of Defendants by Sergeant Robert Nixon of the Utah Highway Patrol ("UHP"). Defendants argue that because the initial stop was improper, and the subsequent detention and search exceeded the scope of the initial stop, the stop and search were illegal and all evidence obtained therefrom should be suppressed. The court held an evidentiary hearing on August 12, 2008, at which time testimony was received from Sergeant Nixon. The United States was represented by Veda Travis. Mr. Morales was represented by Ronald Yengich, and Ms. Bailey was represented by Jamie Zenger.

**Findings of Fact**

On Friday, December 14, 2007, Defendants Mr. Morales and Ms. Bailey were traveling

eastbound on Interstate 70 through Sevier County, Utah. Defendants were traveling in a Black PT Cruiser with Mr. Morales driving and Ms. Bailey riding in the front passenger seat. At approximately 3:40 pm, while traveling in the right-hand lane of Interstate 70, Defendants approached Sergeant Nixon, who was also traveling eastbound in the right-hand lane, but at a slower rate of speed. Sergeant Nixon testified that as he watched the PT Cruiser approach him through his side mirror, he observed the PT Cruiser move to the left-hand lane. As the PT Cruiser made this lane change, Nixon testified that the vehicle's turn signal was not activated until the vehicle had already crossed the center line, in violation of Utah law.[1] (Tr. pp. 62-63, 65.) The PT Cruiser then passed Sergeant Nixon, at a speed that was within the speed limit, after which Nixon himself moved to the left-hand lane and followed the PT Cruiser. After passing a tractor trailer that was traveling in the right-hand lane, the PT Cruiser then moved back to the right-hand lane, again failing to activate its turn signal until the vehicle had crossed the center line.

At the time of this incident, Sergeant Nixon was employed as a K-9 Trooper for UHP's Criminal Interdiction Team. (Tr. pp. 6, 14.) The primary focus of the Criminal Interdiction Team is to apprehend criminals through a high volume of traffic stops. (Tr. p. 6.) As such, members of the team stop as many vehicles as possible that are in violation of the traffic laws.

---

[1] At the time of the stop, Utah Code Ann. § 41-6a-804 provided, in relevant part:

    (1)(a) A person may not turn a vehicle or move right or left on a roadway or change lanes until:
    . . . .
    (b) A signal of intention to turn right or to change lanes shall be given continuously for at least the last two seconds preceding the beginning of the movement.

(Tr. p. 7.) Accordingly, upon seeing the PT Cruiser twice change lanes without activating its signal for the requisite amount of time prior to such a move, Sergeant Nixon initiated a traffic stop.[2]

Upon stopping Defendants' vehicle, Sergeant Nixon approached the vehicle from the passenger's side and observed that the vehicle had a Michigan license plate. (Tr. p. 18.) Once he arrived at the front passenger window, Sergeant Nixon asked Mr. Morales how he was doing and if he had a driver's license. (Tr. p. 19.) As Mr. Morales was getting his driver's license, Sergeant Nixon asked where the two were headed, to which Mr. Morales responded "home." *Id*. Sergeant Nixon took "home" to mean Michigan. *Id*.

Mr. Morales then handed Sergeant Nixon a Michigan driver's license containing the name "Jorge Ramirez," but a photograph of himself.[3] (Tr. pp. 19-20.) Sergeant Nixon testified that as Mr. Morales handed over the license, his hand was noticeably shaking. (Tr. pp. 19, 73.)

After receiving the driver's license, Sergeant Nixon explained to Mr. Morales the reason for the stop (two improper lane-changes) and asked the Defendants questions regarding ownership of the vehicle. (Exh. 1 at 15:40:51 - 15:41:15.) The Defendants initially responded that the vehicle belonged to them, but upon further questioning explained that the vehicle was

---

[2] At the hearing Sergeant Nixon testified that his intent was to stop the Defendants' vehicle after observing the first lane-change violation. (Tr. p. 66.) The video of the stop, however, shows that upon stopping the Defendant, Nixon told Mr. Morales that after observing the first violation, he watched to see if Mr. Morales would repeat the violation again as he passed the tractor trailer. (Video Transcript, Exh. 1 at 15:40:51 - 15:41:12; Tr. pp. 20, 65-66.) Based on that statement, it appears that Nixon may not have made up his mind about making the traffic stop until he observed the second lane-change violation. (*See* Tr. p. 69.)

[3] It was not until after the Defendant was arrested that Sergeant Nixon learned that his real name was Nelson Morales. (Tr. p. 20.)

recently purchased by Ms. Bailey's mother.  (Exh. 1 at 15:41:15 - 15:41:51.)  The documentation Sergeant Nixon received showed that the vehicle was owned by an Elaine Bailey.  (Tr. p. 21.)

Sergeant Nixon then advised Mr. Morales that he intended to issue him a warning for the traffic violation, and asked Mr. Morales if he would mind coming back to his vehicle while he filled out the paper work.  Mr. Morales agreed.  (Exh. 1 at 15:41:51 - 15:41:59.)  As the two men walked back to Sergeant Nixon's patrol car, Sergeant Nixon noticed "quite a bit of luggage and items in the back of the PT Cruiser."  (Tr. p. 21.)

Once Sergeant Nixon and Mr. Morales got into Nixon's patrol car, Sergeant Nixon immediately contacted dispatch and notified them that he was conducting a traffic stop.  (Exh. 1 at 15:42:32 - 15:42:44.)  Sergeant Nixon relayed to dispatch his location and the license plate number of the PT Cruiser and asked dispatch to run a license plate check, a driver's license check, and a criminal history report based on the driver's license number he received from Mr. Morales.  (Exh. 1 at 15:42:44 - 15:43:00.)

Sergeant Nixon then began filling out a warning for the traffic violation.  (Tr. p. 22.)  As he did so, he asked Mr. Morales several questions regarding his travel plans.  (Tr. pp. 22-32.)  In answer to these questions Mr. Morales explained that the passenger, Cindy Bailey, was his girlfriend, and that Cindy's mother, Elaine Bailey, had flown the two of them to California from Michigan to pick up the PT Cruiser from her friends, John and Mary.  (Exh. 1 at 15:43:01 - 15:43:13.)  Mr. Morales explained that John and Mary could no longer afford to make payments on the vehicle, and so Elaine Bailey was taking over those payments and title to the vehicle.  *Id*.  Mr. Morales explained that he had made the trip as a favor, a Christmas gift, to Elaine Bailey, in that she was too old to make such a long drive herself.  (Exh. 1 at 15:43:17 - 15:43:25.)  He

explained that he and Ms. Bailey had flown to California, spent one night there, and then began the drive back to Michigan.  (Exh. 1 at 15:44:48 - 15:45:07.)

Mr. Morales then expressed concern to Sergeant Nixon about making it back to Michigan in time for work.  (Exh. 1 at 15:43:17 - 15:43:25.)  When asked by Sergeant Nixon when he had to be back to work, Mr. Morales said that he needed to be back on Wednesday; when Sergeant Nixon followed up, Mr. Morales changed the day to Thursday.  (Exh. 1 at 15:43:30 - 15:43:52.)

Sergeant Nixon and Mr. Morales continued to talk inside the patrol car as Sergeant Nixon was documenting the traffic violation and waiting to hear back from dispatch regarding the license and vehicle checks.  (Exh. 1 at 15:44:07 - 15:44:18.)  Sergeant Nixon testified that as they talked, Mr. Morales was visibly nervous, with sweat coming down his forehead, and that his nervousness did not subside as the stop progressed.  (Tr. pp. 26-27.)

When Sergeant Nixon asked further questions about the vehicle's ownership, Mr. Morales again explained that Elaine Bailey was the owner.  He explained that although the vehicle had just been recently purchased by Elaine Bailey, the vehicle was already in her name and a Michigan license plate had already been issued.  (Exh. 1 at 15:45:21 - 15:45:28.)  Mr. Morales stated that Cindy Bailey had brought the Michigan license plate with her when the two flew to California.  (Exh. 1 at 15:45:28 - 15:45:30.)  The vehicle registration confirmed this.  It showed that the vehicle had been registered to Elaine Bailey on December 12, 2007, just two days prior to the stop.  (Tr. p. 24.)

Sergeant Nixon was then informed by dispatch that the driver's license and vehicle registration came back valid, and that "Jorge Ramirez" (the name on the license) had no warrants or criminal history.  (Exh. 1 at 15:45:27 - 15:45:50.)  Sergeant Nixon then asked Mr. Morales,

"Did you notice your signal like that, that you just kind of hit it right as you were crossing the line?" (Exh. 1 at 15:46:58 - 15:47:02.)  Mr. Morales replied, "Yeah, well, I understand." (Exh. 1 at 15:47:02 - 15:47:05.)  The two men talked for a minute longer, with Mr. Morales asking Sergeant Nixon about the consequences of a warning and Sergeant Nixon asking a few more follow-up questions about the trip to California. (Exh. 1 at 15:47:06 - 15:48:00.)

     Sergeant Nixon finished the warning and printed it. (Exh. 1 at 15:48:00 - 15:48:22.) He then returned Mr. Morales' documents and issued the warning. (Exh. 1 at 15:48:26 - 15:48:37.) Sergeant Nixon testified that as he returned the documents to Mr. Morales, he noticed that his hands were extremely sweaty. (Tr. p. 32.)  Sergeant Nixon then asked Mr. Morales if had any questions and after Mr. Morales responded that he did not, Sergeant Nixon told him to "have a good day." (Exh. 1 at 15:48:38 - 15:48:41.)  At this point, approximately eight minutes had passed since the stop was first initiated. Mr. Morales then thanked Sergeant Nixon and began to get out of the patrol car.

     As Mr. Morales began to open the patrol car door and leave, Sergeant Nixon asked, "Hey Jorge, do you mind if I talk to you again for a little bit more, is that okay?"  Mr. Morales replied, "sure." (Exh. 1 at 15:48:42 - 15:48:45.)  Apparently, however, Mr. Morales did not fully understand Sergeant Nixon's request because he continued to leave the vehicle. (Tr. pp. 32-33, 55-56.)  Sergeant Nixon then said, "Go ahead and shut the door if that's alright with you.  Come on in if you don't mind.  Can I talk to you for a minute more?" (Exh. 1 at 15:48:45 - 15:48:51.) Mr. Morales asked, "here?" (Exh. 1 at 15:48:52.)  Sergeant Nixon confirmed that he would like to talk to Mr. Morales in the patrol car and asked, "Is that okay, come here for just a minute, if you don't mind.  If that's alright?" (Exh. 1 at 15:48:52 - 15:48:56.)  Mr. Morales then got back

into the patrol car.  (Exh. 1 at 15:48:56 - 15:49:00.)

Sergeant Nixon then told Mr. Morales why he wanted to ask him additional questions, explaining that Interstate 70 is a major corridor for drugs and other illegal activity.  (Exh. 1 at 15:49:00 - 15:49:09.)  Sergeant Nixon asked Mr. Morales if he had anything illegal in the vehicle; Mr. Morales replied, "Not that I recall."  (Exh. 1 at 15:49:09 - 15:49:14.)  Sergeant Nixon asked if there were any weapons in the vehicle; Mr. Morales said, "You're more than welcome to check it."  (Exh. 1 at 15:49:14 - 15:49:18.)  Sergeant Nixon asked further about weapons, explosives and drugs, specifically asking about marijuana, methamphetamine, cocaine and heroin.  Mr. Morales indicated that none of those items were in the vehicle.  (Exh. 1 at 15:49:18 - 15:49:29.)  Sergeant Nixon then asked, "Can I search the car?"  Mr. Morales responded, "Yes sir, you're more than welcome."  (Exh.1 at 15:49:29 - 15:49:31.)

Sergeant Nixon told Mr. Morales that he first wanted to talk to Cindy Bailey, and asked if that would be alright with him.  Mr. Morales indicated it was.  Sergeant Nixon asked Mr. Morales if he would mind waiting in the patrol car as Sergeant Nixon spoke with Ms. Bailey, to which Mr. Morales replied, "sure."  (Exh. 1 at 15:49:32 - 15:49:44.)

Sergeant Nixon then approached the PT Cruiser and made contact with Ms. Bailey, asking, "Mind if I talk to you for a minute, is that okay?"  Ms. Bailey agreed to talk to Sergeant Nixon.  (Exh. 1 at 15:49:45 - 15:50:02.)  Sergeant Nixon asked Ms. Bailey a number of questions about Mr. Morales and the trip to California.  (Exh. 1 at 15:50:02 - 15:50:52.)  He then explained to Ms. Bailey that Interstate 70 is a major corridor for illegal activity and asked whether there were any weapons or drugs in the vehicle.  Ms. Bailey responded that there were none.  (Exh. 1 at 15:50:53 - 15:51:14.)  Sergeant Nixon then asked, "Can I search your car?"  Ms. Bailey

responded, "Yeah." (Exh. 1 at 15:51:14 - 15:51:20.)

Sergeant Nixon asked Ms. Bailey if she would leave the vehicle and stand outside while he searched it. Ms. Bailey agreed. (Exh. 1 at 15:51:25 - 15:51:40.) Sergeant Nixon then approached Mr. Morales, who was still seated in Sergeant Nixon's patrol car, and asked him if he would be willing to stand outside with Ms. Bailey while he searched the PT Cruiser. Mr. Morales agreed. Mr. Morales and Ms. Bailey then walked in front of the PT Cruiser, where they stood as Sergeant Nixon searched their vehicle. (Exh. 1 at 15:51:40 - 15:52:49.)

After searching the PT Cruiser for several minutes, Sergeant Nixon located what he believed to be an after-market hidden compartment. (Tr. p. 39.) Sergeant Nixon told Mr. Morales that he would like to put his dog in the back of the vehicle and asked if that would be okay. Mr. Morales agreed. (Exh. 1 at 16:06:40.) Sergeant Nixon's dog was then deployed, alerted to the odor of narcotics, and aggressively indicated on the rear hatch. (Exh. 1 at 16:08:30 - 16:08:45.)

Sergeant Nixon then closely inspected the area where his dog had alerted, specifically looking into the hidden compartment, and saw a package containing what appeared to be narcotics. (Tr. p. 43.) Upon seeing this package, Sergeant Nixon arrested Mr. Morales and Ms. Bailey. (Tr. p. 43.) Subsequently, thirty-four kilograms of cocaine were discovered in Defendants' vehicle. (Tr. p. 43.)

**Analysis**

In their motion to suppress, Defendants assert that the evidence seized from the vehicle must be suppressed as "fruit of the poisonous tree" because the initial stop was improper and the detention unlawfully exceeded the scope of the initial stop, making Defendants' consent to

search involuntary.  The government argues that Sergeant Nixon had both reasonable suspicion and consent to prolong the detention.  Therefore, the government argues that the Defendants' subsequent consent to search the vehicle was voluntary and the evidence seized therefrom should not be suppressed.

I.      The Traffic Stop

A traffic stop is a seizure within the meaning of the Fourth Amendment.  *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005).  However, because it is "more analogous to an investigative detention than a custodial arrest[,]" we analyze such stops under the two-part test set forth in *Terry v. Ohio*, 392 U.S. 1, 20 (1968).  *Id.* (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998)).  Under that test, the court must first determine "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry*, 392 U.S. at 20.

   A.   The Initial Stop of Defendants' Vehicle

Counsel for Mr. Morales asks the court to find that the initial stop of Defendants' vehicle was improper under the Fourth Amendment. Counsel argues that Sergeant Nixon lacks credibility and, therefore, with no other evidence to support Sergeant Nixon's assertion that a traffic violation actually occurred, there is insufficient evidence to establish that there was a lawful basis for the traffic stop.  "A traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995); *see Hunnicutt*, 135 F.3d at 1348.  It is

irrelevant that the officer may have had other subjective motives for stopping the vehicle.  *See Botero-Ospina*, 71 F.3d at 787; *accord Whren v. United States*, 517 U.S. 806, 810-19 (1996).  "Our sole inquiry is whether the particular officer had reasonable suspicion that the particular motorist violated any of the multitude of applicable traffic and equipment regulations of the jurisdiction." *Hunnicutt*, 135 F.3d at 1348 (citing *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)).

       Sergeant Nixon testified that he twice observed Mr. Morales violate § 41-6a-804(1) of the Utah Code, which provides that a driver cannot move right or left on a roadway, or change lanes, until a signal has been "given continuously for at least the last two seconds preceding the beginning of the movement."  Although Defendants have attacked Sergeant Nixon's credibility on this issue, the videotape of the incident supports Sergeant Nixon's version of the events.  In the videotape, when Sergeant Nixon first approached Mr. Morales, Sergeant Nixon explained the reason for the stop – that Mr. Morales had failed to properly signal when moving in and out of the right-hand lane.  Mr. Morales indicated that he understood the reason for the stop and did not disagree with Sergeant Nixon's statement.  (Exh. 1 at 15:40:51 - 15:41:15.)  Moreover, later on in the stop, as Mr. Morales and Sergeant Nixon were sitting in Sergeant Nixon's patrol car, Sergeant Nixon once again explained the reason for the initial stop, asking Mr. Morales if he had noticed hitting the turn signal as he crossed the center line.  Mr. Morales again acknowledged the violation and offered no disagreement.  (Exh. 1 at 15:46:58 - 15:47:05.)  As such, Sergeant Nixon's testimony regarding the reason for the initial stop is uncontroverted, and is in fact, supported by the evidence.  Therefore, the initial stop of Defendants' vehicle was valid.

      B.     <u>The Detention</u>

Having found that the traffic stop of the Defendants' vehicle was justified at its inception, the court must determine "whether the officer's actions during the detention were reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. The Supreme Court has explained that "an investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "An investigative detention may be expanded beyond its original purpose, however, if during the initial stop the detaining officer acquires 'reasonable suspicion' of criminal activity," *United States v. Villa-Chaparro*, 115 F.3d 797, 801 (10th Cir. 1997), or the stop becomes a consensual encounter. *United States v. Chavira*, 467 F.3d 1286, 1290 (10th Cir. 2006).

        1.      <u>Reasonable Suspicion of Criminal Activity</u>

From the time of the initial stop of Defendants' vehicle to the time the traffic warning was issued, approximately eight minutes lapsed. During these eight minutes, Sergeant Nixon explained the violation, obtained documents from the Defendants, took Mr. Morales back to the patrol car, contacted dispatch (who ran several checks), filled in the warning, further discussed the violation, and finally issued the warning. Sergeant Nixon also asked Mr. Morales questions regarding Mr. Morales' travel plans, his relationship to Ms. Bailey, details of their trip to California, and Mr. Morales' occupation.

Although Sergeant Nixon asked Mr. Morales questions that were not directly related to the traffic stop, these additional questions did not prolong the detention. *See United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005) ("As long as the trooper's questioning did not

extend the length of the detention, . . . there is no Fourth Amendment issue with respect to the content of the questions."). They were asked while Sergeant Nixon was both filling out the warning and waiting for information from dispatch. Furthermore, the questions were primarily centered on Defendants' travel plans and ownership of the vehicle. It is well established that such questions are proper during a lawful traffic stop. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006). Therefore, at no time during the first eight minutes of the traffic stop were the Defendants unlawfully detained.

The problem in this case arises because the encounter did not end once the warning was issued. Rather, after issuing the warning Sergeant Nixon explained to Mr. Morales that because Interstate 70 is a major corridor for illegal trafficking, he wanted to ask him some additional questions. (Exh. 1 at 15:49:00 - 15:49:10.) The issue then is whether during the prior eight minutes, Sergeant Nixon obtained a reasonable articulable suspicion that Mr. Morales was engaged in criminal activity sufficient to prolong the detention. *Villa-Chapparro*, 115 F.3d at 801-02.

In developing reasonable suspicion, an officer is allowed "to draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations and quotations omitted). When analyzing whether reasonable suspicion exists, courts should not "pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious. Rather, the reasonable suspicion calculus turns on whether the specific articulable facts, when viewed together through the lens of a reasonable law enforcement officer, justified a brief roadside detention." *United States v.*

*Doyle*, 129 F.3d 1372, 1376 (10th Cir. 1997).

The government points to the following facts to support Sergeant Nixon's claim of reasonable suspicion: (1) Mr. Morales' extreme nervousness from the inception of the stop to the end; (2) Defendants had only stayed one night in California before traveling back to Michigan, yet they had "quite a bit of luggage;" (3) the person to whom the vehicle was registered was not present; (4) the vehicle was already registered and licensed in the state of Michigan (carrying a Michigan license plate), although it had been purchased in California just two days before; and (5) the Defendants were traveling on a known drug pipeline.

The facts and circumstances of this case, however, when taken in their totality, "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Reid v. Georgia*, 448 U.S. 438, 441 (1980). Mr. Morales' nervousness describes most persons when stopped by the police. And although told that "probably" only a warning will be issued, the nervousness will often not subside until the warning is actually in hand. With regard to the luggage, Defendants were traveling across the country, which is at best a three to four day trip, in addition to the one to two days already spent in California. Furthermore, it was Christmas time, and much of the baggage in the Defendants' vehicle appeared to be shopping bags (perhaps Christmas gifts).[4]

The government also finds support for Sergeant Nixon's claim of reasonable suspicion in

---

[4]It is not lost on the court that time and time again officers cite as a factor supporting their reasonable suspicion of criminal activity the fact that very little luggage was present in the car when the defendant was allegedly traveling a long distance. Apparently the luggage factor cuts both ways.

13

the fact that the vehicle was properly registered on the date of purchase. But extended detentions must be justified by a reasonable articulable suspicion of criminal activity, not lawful behavior. Citizens should be encouraged to properly register their vehicles, not penalized for it. One can only imagine the suspicions that would have arisen and been articulated by Sergeant Nixon had Elaine Bailey not transferred ownership of the vehicle to her name prior to having her daughter and her daughter's boyfriend drive it back to Michigan.

With regard to traveling on a drug pipeline, Sergeant Nixon testified that virtually every highway in Utah is considered a drug pipeline. Therefore, this is a non-factor.

The facts relied on by Sergeant Nixon to find reasonable suspicion of criminal activity in this case, encompass far too much innocent behavior. Accordingly, the court finds the evidence insufficient to justify Defendants' continued detention based on reasonable suspicion. Therefore, in order for Mr. Morales' continued detention to be lawful, it must have become a "consensual encounter."

### 2.     Consensual Encounter

The Tenth Circuit has provided that once an officer has returned the driver's license and registration in a routine traffic stop, the officer may ask additional questions (including questions about drugs and weapons or a request for voluntary consent to search) as part of an ordinary consensual encounter so long as a reasonable person under the circumstances would believe he was free to leave or free to disregard the officer's request for information. *United States v. McKneely*, 6 F.3d 1447, 1451 (10th Cir. 1993) (quoting *United States v. Turner*, 928 F.2d 956, 958 (10th Cir.), *cert. denied*, 502 U.S. 881 (1991)).

The court considers whether a reasonable person would feel free to leave under a totality of the circumstances test. *United States v. Glass*, 128 F.3d 1398, 1406 (10th Cir. 1997). Relevant considerations include, but are not limited to whether the encounter occurred in a confined or nonpublic space; the officers confronting the subject were armed or uniformed; more than one officer confronted the subject; the officers exhibited an intimidating or coercive demeanor; and the officers asked the subject potentially incriminating questions. *Id.* (citations omitted). Additional factors which may indicate a seizure rather than a consensual encounter include the "physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The Tenth Circuit, however, has steadfastly refused to view any one factor as dispositive. *Glass*, 128 F.3d at 1406.

Here, there was no coercive show of authority by Sergeant Nixon. Upon returning Mr. Morales' documents and issuing the warning, Sergeant Nixon told Mr. Morales to "have a good day." At this point, Mr. Morales was free to leave. As Mr. Morales was exiting the vehicle, Sergeant Nixon requested permission to ask additional questions. His request was not accompanied by a show of force, neither was it stated in a menacing or demeaning tone. Rather, the conversation was as follows:

| | |
|---|---|
| Sergeant Nixon: | Hey Jorge – do you mind if I talk to you again for a little bit more?  Is that okay? |
| Mr. Morales: | Sure. |
| Sergeant Nixon: | Is that alright?  Go ahead and shut the door if that's alright with you.  Come on in if you don't mind. |
| Mr. Morales: | What's up? |

| | |
|---|---|
| Sergeant Nixon: | Do you mind – can I talk to you for a minute more? |
| Mr. Morales: | In here? |
| Sergeant Nixon: | Yeah, is that okay?  Alright.  Come here for just a minute.  If you don't mind – if that's alright? |

(Exh. 1 at 15:48:43 - 15:49:00.)  Mr. Morales then sat back down in Sergeant Nixon's patrol car.

In light of these facts, the court concludes that the investigative detention ended when Sergeant Nixon issued the warning and told Mr. Morales to "have a good day."  At that point, the encounter between Sergeant Nixon and Mr. Morales became a consensual encounter between a private citizen and a law enforcement official.  *See United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir. 1990) (providing that investigative detention ended when the officer returned defendant's license and registration papers, and that subsequent encounter was a "consensual encounter between a private citizen and law enforcement official").  *See also United States v. Elliott*, 107 F.3d 810, 814 (10th Cir. 1997) (providing that the traffic detention ended when the officer returned the driver's documentation and the driver's subsequent encounter with the officer was consensual, even though the officer did not inform the driver she was free to leave, where the officer's questioning was not accompanied by a coercive show of authority); *Turner*, 928 F.2d at 959 (providing that the return of a driver's documents ends the detention unless there is evidence of a "coercive show of authority").

II.     Consent to Search the Vehicle

During the course of the consensual encounter, Sergeant Nixon asked for permission to search Defendants' vehicle.  A search conducted pursuant to consent is an exception to the warrant requirement of the Fourth Amendment.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  Valid consent is that which is "freely and voluntarily given."  *Id*. at 222 (quoting

*Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). Whether consent was voluntarily and freely given is a question of fact to be determined from the totality of the circumstances. *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir.), *cert. denied*, 525 U.S. 903 (1998).

The government has the burden of proving valid consent. *Id.* "First, it must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'" *Id.* (quoting *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995)). "Second, the government must show that the police did not coerce the individual into granting consent." *Id.*

The video of the encounter provides objective evidence regarding the nature of the consent to search given by Mr. Morales, and shows that it was freely and voluntarily given. When asked by Sergeant Nixon whether Defendants' vehicle contained any weapons, Mr. Morales responded, "You're more than welcome to check it." (Exh. 1 at 15:49:14 - 15:49:18.) After asking additional questions about possible contraband, Sergeant Nixon asked, "Can I search the car?" Mr. Morales again responded, "Yes sir, you're more than welcome." (Exh. 1 at 15:49:29 - 15:49:31.)

In seeking permission to search Defendants' vehicle, Sergeant Nixon did not coerce or threaten Mr. Morales in anyway. Sergeant Nixon did not touch Mr. Morales, he did not use aggressive language, neither did he use a demeaning tone. Furthermore, consent was given during daylight hours, on a public highway, and after Mr. Morales was in possession of all his personal documents and a warning had been issued. *See United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996).

In light of these facts, the court finds that Mr. Morales' consent to search the vehicle was

freely and voluntarily given, and was not the product of threats or coercion. Accordingly, the warrantless search of the vehicle, was a valid consent-based search.

III.     Passenger's Consent to Search the Vehicle

Counsel for Ms. Bailey argues that the consent to search obtained from Ms. Bailey was not voluntarily given and was thus invalid. For a period of eight minutes, Ms. Bailey waited in the passenger seat of the PT Cruiser while her boyfriend was in Sergeant Nixon's patrol car being questioned. When approached by Sergeant Nixon, Ms. Bailey was not aware that the traffic stop had ended, neither was she given any intimation that she was free to leave. To the contrary, she was approached by an officer she believed to be detaining her boyfriend, and was asked questions regarding their travel plans and whether they were transporting any contraband. Counsel for Ms. Bailey argues that under these circumstances, no reasonable person would have felt free to leave or to disregard the officer's requests.

But having found that Mr. Morales' consent to search was voluntarily and freely given, Ms. Bailey's arguments are moot. Sergeant Nixon's encounter with Ms. Bailey was in large measure superfluous. The record demonstrates that Sergeant Nixon had determined to search the vehicle before approaching Ms. Bailey. Furthermore, in questioning Ms. Bailey, Sergeant Nixon did not garner any additional information, neither were his suspicions of criminal activity increased. Stated differently, Sergeant Nixon's encounter with Ms. Bailey did not cause him to search the vehicle.

In addition, Ms. Bailey's consent to search the vehicle was not necessary. In the instant case, Mr. Morales and Ms. Bailey shared common authority over the vehicle during the drive across the country. *See United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974) (defining

"common authority" as the "mutual use of the property by persons generally having joint access or control for most purposes"). "If common authority is established, the person whose property is searched is unjustified in claiming an expectation of privacy in the property because that person cannot reasonably believe that the joint user will not, under certain circumstances, allow a search in [his] own right." *United States v. McAlpine*, 919 F.2d 1461, 1463 (10th Cir. 1990). Accordingly, Mr. Morales' consent to search the vehicle was sufficient, and Sergeant Nixon's search of the PT Cruiser was a valid consent-based search.

## Conclusion

For the foregoing reasons, the court finds that Sergeant Nixon's stop, detention, and subsequent search of Defendants and their vehicle were valid under the Fourth Amendment. Accordingly, Defendants' motion to suppress is DENIED.

**IT IS SO ORDERED.**

DATED this 8th day of December, 2008.

Dee Benson
United States District Judge